UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| LORIA PORTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:25-cv-03011-SEM-DJQ |
| | ) | |
| SEDGWICK CLAIMS MANAGEMENT | ) | |
| SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

OPINION AND ORDER

Before the Court is Defendant Sedgwick Claims Management Services Inc.'s

("Sedgwick") April 28, 2025, Motion to Compel Arbitration pursuant to the Federal

Arbitration Act (FAA). (Doc. 13).[1]

After receiving the briefs in support of and in opposition to the Motion, the Court

sought further clarification regarding Sedgwick's relationship with LanceSoft, Inc.

("LanceSoft") and Magnit, Inc. ("Magnit"). (Text Order 06/16/2025). The Court considers

such evidence without converting the motion into a Rule 56 motion. *See Rodgers-Rouzier*

*v. American Queen Steamboat Operating Company, LLC and HMS Global Martine LLC*, 104

F.4th 978, 984 (7th Cir. 2024) (implying that although Fed. R. Civ. P. 12(b)(3) does not

apply to motions to compel arbitration, common law principles allow the consideration

of extrinsic materials without implicating Rule 56). For the reasons set forth below, the

---

[1] In this Order, the Court is not addressing Sedgwick's request for dismissal contained in the same motion that is not based upon arbitration. *Smith v. Spizzirri,* 601 U.S. 472, 478 (2024).

Court finds Sedgwick is a third-party beneficiary to the contract Plaintiff Loria Porter ("Porter") agreed to with LanceSoft that mandates her wage dispute be submitted to arbitration. Thus, Sedgwick's Motion to Compel Arbitration, (Doc. 13), is GRANTED.

I.     FACTS

There are four contractual documents germane to resolving whether Porter's agreement with LanceSoft mandates arbitration and if yes, whether Sedgwick is a third-party beneficiary to that contract. First, is a Management Services Agreement between Sedgwick and Workforce Logiq ("Magnit").[2] Second, is a Supplier Agreement between Magnit and LanceSoft. Third, is the signed employment offer between LanceSoft and Porter. Fourth, is the signed Employment Agreement between LanceSoft and Porter. Each of these agreements are explained in turn.

A. The May 2021 Management Services Agreement
Between Sedgwick and Magnit

Sedgwick and Magnit entered into a Management Services Agreement in May 2021, (Doc. 21-2, p. 5–7), and later amended it in April 2024. (Doc. 21-2, p. 15). The amendment updates the name, address, and background screening requirements and is not relevant to this Order. Under the Management Services Agreement, Magnit agreed to provide "administrative management" over Sedgwick's contingent workforce program. *Id*. at 6. This agreement allowed Magnit to enter into "direct contracts with suppliers" and to manage invoice set up and processing. *Id*. The agreement specifically

---

[2] Magnit acquired Workforce Logiq in October 2021. Thus, the Court will use Workforce Logiq and Magnit interchangeably and refer to Workforce Logiq as "Magnit" when not in direct quotation.

identifies Sedgwick as the customer. *Id*. Put differently, this agreement authorized Magnit to enter into contracts with suppliers, such as LanceSoft, on Sedgwick's behalf.

>    B. The June 2021 Supplier Agreement Between
>        Magnit and LanceSoft

In June 2021, Magnit and LanceSoft entered into a Supplier Agreement. (Doc. 21-1, p. 4–21). The Preliminary Statement of the agreement provides that "[i]n connection with Workforce Logiq' performance of its obligations to [Sedgwick], Workforce Logiq desires to retain [LanceSoft] to provide staffing services on an as needed basis" for Sedgwick and that "[a]ny engagement of [LanceSoft] by Workforce Logiq is subject to [Sedgwick] approval." *Id*. at 4. The Preliminary Statement also specifically references Magnit's May 2021 Management Services Agreement with Sedgwick. *Id*. The Supplier Agreement refers to Sedgwick as "Customer" with whom Magnit "has agreed to provide services related to [Sedgwick's] temporary workforce." *Id*. LanceSoft is the "Supplier." *Id*. It also clearly makes Sedgwick an intended third-party beneficiary of the Supplier Agreement. Relevant portions of the contract are set forth below:

# WORKFORCE LOGIQ



**Exhibit**

**C**

**Supplier Agreement**

This Supplier Agreement including all schedules and attachments hereto (collectively, the "**Agreement**") is entered into with an effective date of _6/18/2021_ ("**Effective Date**"), between **APC Workforce Solutions, LLC d/b/a Workforce Logiq** ("**Workforce Logiq**"), and _LanceSoft, Inc._ with its principal place of business located at _13454 Sunrise Valley Drive, Suite 120, Herndon, VA 20171_ ("**Supplier**").

**Preliminary Statement**

Workforce Logiq and Sedgwick Claims Management Services, Inc. ("**Customer**") have entered into an agreement pursuant to which Workforce Logiq has agreed to provide services related to Customer's temporary workforce. In connection with Workforce Logiq' performance of its obligations to Customer, Workforce Logiq desires to retain Supplier to provide staffing services on an as needed basis to Workforce Logiq's Customer. Staffing services ("**Services**") are defined as the efforts involving recruitment, screening, selecting, hiring, training, testing, assigning, paying, providing insurance coverage, withholding and remitting taxes relative to employees as required hereunder, and ensuring compliance with all obligations that are provided in this Agreement and in general. "**Work**" means all work performed or prepared for Customer by the Supplier's employees placed on assignment to the Customer in accordance with this Agreement including, without limitation, all programs, derivative works, source code, object code, discoveries, concepts, inventions, innovations, improvements, materials, documentation, techniques, methods, processes and ideas which are conceived, made, proposed or developed by such Supplier's employees alone or with others, in connection with any Work Order hereunder, whether or not prepared on or off Customer's premises or during regular work hours. "**Affiliate**" means any entity directly or indirectly controlling, controlled by or under common control with another entity, where "control" means ownership or the right to direct the management of such entity.

NOW, THEREFORE, in consideration of the mutual agreements of the parties and other good and valuable consideration, receipt of which is hereby acknowledged, the parties agree as follows:

**(f) Intended Third-Party Beneficiary/Enforcement.** The unique abilities, knowledge and skill of Supplier and Supplier Workers constitute material consideration of this Agreement. Supplier understands and agrees that Customers are intended third-party beneficiaries of the Agreement, the Services performed and Work provided pursuant to the Agreement and shall have the same rights, titles and interests in and to the Services performed and Work provided as Workforce Logiq, and shall be entitled to enforce such legal rights available to it under this Agreement and all Schedules hereto as it would have were it a party hereto.

"(f) Intended Third-Party Beneficiary/Enforcement" (Doc. 21-1, p. 6). This subsection states:

> Supplier understands and agrees that Customers are intended third-party beneficiaries of the Agreement, the Services performed and Work provided pursuant to this agreement *shall have the same rights, titles and interests in and to the Services performed and Work provided as Workforce Logiq, and shall be entitled to enforce such legal rights available to it under this Agreement and all Schedules hereto as it would have were it a party hereto.*"

(Doc. 21-1, p. 6)(emphasis added).

4

## C.  Signed August 2024 Employment Offer

On August 16, 2024, Porter signed an employment offer from LanceSoft. (Doc. 14-1, p. 5–6). The employment offer details the agreement between Porter and LanceSoft, and specifically states that she will be assigned to work at Sedgwick, and Sedgwick is expressly referred to as LanceSoft's "client." *Id.* The offer was also completely contingent on Sedgwick's final approval. *Id.* The employment offer is below:

August 16th, 2024

Dear **Loria Killey Porter,**

It gives me great pleasure to extend to you an offer of employment with LanceSoft Inc. (On a new assignment), as **Service Centre Associate.** You will be initially assigned by LanceSoft Inc on a project at **Sedgwick Claims Management Services, Inc. .** This project is tentatively scheduled to begin on **8/26/2024** subject to client specified Drug Test and/or BI clearance and is located at **Detroit, Michigan 48205 .**

This offer letter is contingent upon you starting the project at **Sedgwick Claims Management Services, Inc..** The terms of the offer are:

- **$15.00 USD Per hour.** LanceSoft Inc payroll is run on a weekly basis (please refer to the payroll calendar for details).
- Details as per attached offer acceptance letter, if applicable.
- Client approved signed Timesheets should be submitted every week.
- LanceSoft Inc will reimburse all client related Travel expenses subject to the following conditions:
    1. The required Client approval in writing is obtained.
    2. The client payments to LanceSoft Inc for these expenses have been completed.
    3. You would be responsible to understand and follow the travel policy of the client as defined in the client provided documentation.
    4. LanceSoft Inc would require you to submit the expenses and the supporting receipts in the format prescribed by the client.

The offer is contingent upon your acceptance, signing, and completion of the following.

- Upon Background and/or Drug test clearance as per client requirement
- LanceSoft Inc Employment agreement
- Acknowledgement of LanceSoft Inc employee Handbook
- Your acceptance of all client conditions and documents related to worksite rules, confidentiality and any other documents required by the client.

As a full-time employee, you will be eligible to participate in LanceSoft Inc Employee Benefit Plans which include a Healthcare/Medical Insurance Plan, Dental and the LanceSoft Inc 401K.

*Hourly employees are not eligible for paid leave as explained in the Employee Handbook.*

5

In consideration of your employment by the Company, you further agree to enter into a written agreement that will require you to protect and safeguard all confidential and proprietary information of the Company. In addition, you agree that all inventions, discoveries or improvements originated during your employment and which are capable of use in any way in connection with the business of the Company will belong to the Company.

The offer of employment described herein is conditioned on your beginning employment with the Company not later subject to your clearance of the Drug Test and/or Background check as per client requirement. You also understand and agree that this offer of employment is contingent upon the final approval of the client permitting you to commence the project at its site. This LanceSoft offer would stand immediately withdrawn in the event of client cancellation of the offer OR LanceSoft Inc not receiving the final approval from the client to start your employment. This offer of employment is an offer for employment at will and is not in any way an offer either implied or express, for employment for any term or guarantee of employment for any specific term. Nothing contained in this letter is meant to create any employment agreement or other relationship other than an "at will" relationship.

We certainly look forward to working with you as a part of the LanceSoft Inc team. If you have any questions regarding this letter, please do not hesitate to call me directly at 703-674-4553.

Sincerely                                        Accepted

**LanceSoft Inc**                                **Loria Killey Porter**

*[signature]*                                    Digitally signed by: Loria
                                                 Killey Porter on 8/16/2024
                                                 Authorized by: LanceSoft
                                                 Inc

**Alyssa Wagner**                                **Employee Signature**

**Finance**                                      Dated: 8/16/2024

Dated: 8/16/2024

### D.  Signed August 2024 Employment Agreement

On August 16, 2024, Porter also signed LanceSoft's Employment Agreement.  The Employment Agreement contains provisions detailing the employment relationship and most relevant, the "Mutual Dispute Resolution Policy" ("DRP") and the Choice of Law clause (Doc. 14-1, p. 8–9).  Under Porter's Employment Agreement, the DRP covers disputes between Porter and LanceSoft, including LanceSoft's "customers" and "clients." *Id*. It mandates that "[a]ny dispute or claim between an employee and the Company (including its agents, parents, subsidiaries, affiliated companies, insures, customers, clients, or successors) arising out of the employment relationship shall be settled exclusively by binding arbitration." *Id*. Relevant parts are set forth below:

# EMPLOYMENT AGREEMENT

This **EMPLOYMENT AGREEMENT** is entered into by and between LanceSoft Inc ("the company"), and **Loria Killey Porter** dated this **August 16th, 2024.**

1.**Employment Relationship**: Employee shall be employed by the Company as an employee-at-will in the position of **Service Centre Associate** the parties agree otherwise in a writing signed by Representative of the Company and by the Employee. While Employee may be assigned work at locations of the Company's clients, Employee agrees to represent only the Company and no other person or company at such client site. Employee understands that the Company desires Employee to stay on any assigned project until it is completed or until the assignment is terminated by the Company or its client. However, the Company may terminate Employee's employment at any time, with or without notice and for any reason or no reason at all; Employee may terminate the Employee's employment for any reason or for no reason at all, upon two weeks written notice.

2.**Client Property**: On the last day of employment, Employee will immediately return all confidential information and Company or client property including any badges, computers, software, etc. and peacefully leave the client site. Employee acknowledges that his/her failure to do so will result in the company pursuing all legal and equitable remedies to recover the cost of such property. Where permitted by local law, this employment agreement will serve as authorization to deduct the value of such property from any final pay or other monies owed to Employee.

3.**Policies:** Employee will comply with all of the Company's policies, as may be amended by the Company from time to time, including but not limited to those pertaining to anti-harassment, non-discrimination, confidentiality of Company information, safety and wage payment.

4.**Confidentiality:** In consideration of entering into this Employment Agreement and being given access to confidential information and about the Company's business, Employee acknowledges that the use, disclosure or misappropriation of any such information would cause Company to suffer substantial and irreparable harm and that, therefore, the following restrictive covenants are required for the protection of the legitimate business interests and goodwill of Company:

- Employee will not disclose any of the Company's confidential information to the Client, or any other party, without Company's express written consent. This shall include but not be limited to: sales processes; sub-tier relationships, billing, invoicing strategies or issues, etc.
- Employee will not disclose any of the Client's confidential information to any third party, nor remove or utilize any Client confidential information from the Client or the Company's premises except in providing direct services as required by the Client, without the Company's express written consent.
- Employee will, under no circumstances, discuss with the Client or any consulting company or agency the terms of this agreement or any problems of any nature pertaining to issues or disputes that may exist or arise between Employee and the Company.

6. **Mutual Dispute Resolution Policy (DRP):**

Covered Claims Any dispute or claim between an employee and the Company (including its agents, parents, subsidiaries, affiliated companies, insurers, customers, clients, or successors) arising out of the employment relationship shall be settled exclusively by binding arbitration. However, either the employee or the Company may request injunctive relief from a court of competent jurisdiction to preserve the status quo pending arbitration. While nothing in this Agreement precludes Employee from filing a charge with the Equal Employment Opportunity Commission or similar state or local agency, the parties intend that all claims between them as covered by this Agreement are to be resolved through binding arbitration, not an administrative proceeding.

Covered claims include, but are not limited to, claims for wages and other compensation, breach of contract, misappropriation of trade secrets or unfair competition, violation of public policy, wrongful termination; tort claims; claims for unlawful retaliation, discrimination and/or harassment; and claims for violation of any federal, state, or other government law, statute, regulation, or ordinance, such as, for example, claims under the Age Discrimination in Employment Act, Title VII of the Civil Rights Act of 1964; the Fair Labor Standards Act; the Family and Medical Leave Act; the Americans with Disabilities Act of 1990; the Rehabilitation Act of 1973; Section 1981 through 1988 of Title 42 of the United States Code; the Equal Pay Act of 1963; the Pregnancy Discrimination Act and the Private Attorneys' General Act ("PAGA").

Claims that are not covered include: claims for sexual assault or sexual harassment to the extent prohibited by federal law, workers' compensation, or unemployment benefits; petitions or charges that could be brought before the National Labor Relations Board; claims under employee pension or welfare benefit plans; and claims which are not subject to mandatory binding pre-dispute arbitration pursuant to federal law.

Waiver of Multi-Plaintiff, Class, Collective and Representative Actions Except where prohibited by federal law, covered claims must be brought in arbitration on an individual basis only. Any disputes concerning the validity of this multi-plaintiff, class, collective and representative or PAGA waiver will be decided by a court of competent jurisdiction, not by the arbitrator. In the event a court determines that this waiver is unenforceable with respect to any claim or portion of a claim, this waiver shall not apply to that claim or portion of the claim, which may then only proceed in court as the exclusive forum.

Procedures: The demand for arbitration must be in writing and made within the time period required under the applicable statute of limitations. The arbitration shall be before a single neutral arbitrator and administered by the Judicial Arbitration and Mediation Service ("JAMS") in the county in which the dispute arose unless the parties agree otherwise. The JAMS Employment Arbitration Rules & Procedures ("JAMS rules") shall govern the arbitration proceedings, but to the extent they conflict with this DRP, the provisions of this DRP shall apply. Employees may obtain a copy of the JAMS rules at jamsadr.com, by calling JAMS at (800) 352-5267, or by contacting Human Resources. The Company shall pay all arbitration fees and costs that would not be incurred in a court proceeding.

Governing Law and Severability: The Federal Arbitration Act (9 U.S.C. Sections 1, et seq.) shall govern this DRP. If any provision of this DRP, or portion thereof, is held to be invalid, void, or unenforceable, it shall be interpreted in a manner or modified to make it enforceable. If that is not possible, it shall be severed and the remaining provisions of this DRP shall remain in full force and effect.

I UNDERSTAND THAT THE DRP IS AN AGREEMENT THAT REQUIRES DISPUTES THAT INVOLVE THE MATTERS SUBJECT TO THE DRP BE SUBMITTED TO ARBITRATION PURSUANT TO THE DRP RATHER THAN TO A JUDGE AND JURY IN COURT. I AGREE TO SUBMIT SUCH DISPUTES TO ARIBITRATION

7. **Miscellaneous:**

1. This Agreement is personal to the Employee and, without the prior written consent of the Company, shall not be assignable by the Employee.
2. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement.  If any provision of this Agreement shall be held invalid or unenforceable in part, the remaining portion of such provision, together with all other provisions of this Agreement, shall remain valid and enforceable and continue in full force and effect to the fullest extent consistent with law.
3. The validity, construction, interpretation, and enforceability of this Agreement shall be determined and governed by the laws of the Commonwealth of Virginia.
4. The Employee and the Company acknowledge that this Agreement supersedes any other agreement, whether written or oral, between them concerning the subject matter hereof.

**IN WITNESS WHEREOF** the Employee has hereunto set the Employee's hand, and the Company has caused this Agreement to be executed in its name on its behalf, all as of the day and year first above written.

**Employer**
**LanceSoft Inc**

*alwagner*

**Alyssa Wagner**
**Finance**
Dated: 8/16/2024

**Employee**
**Loria Killey Porter**

Digitally signed by: Loria
Killey Porter on 8/16/2024
Authorized by: LanceSoft
Inc

**Employee Signature**
Dated: 8/16/2024

II.    ANALYSIS

The "primary substantive provision" of the Federal Arbitration Act ("FAA")

provides:

> A written provision in . . . a contract evidencing a transaction
> involving commerce to settle by arbitration a controversy
> thereafter arising out of such contract or transaction . . . shall
> be valid, irrevocable, and enforceable, save upon such
> grounds as exist at law or in equity for the revocation of any
> contract.

9 U.S.C. § 2; *See Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 24,

103 S. Ct. 927, 74 L.Ed.2d 765 (1983); *see also AT&T Mobility LLC v. Concepcion*, 563 U.S.

333, 339, 131 S. Ct. 1740, 1745, 179 L. Ed. 2d 742 (2011).

The Supreme Court has explained that Section 2 of the FAA "makes arbitration

agreements 'valid, irrevocable, and enforceable' as [they are] written (subject, of course,

to the saving clause); Section 3 requires courts to stay litigation of arbitral claims pending

arbitration of those claims 'in accordance with the terms of the agreement'; and Section 4

requires courts to compel arbitration 'in accordance with the terms of the agreement'

upon the motion of either party to the agreement (assuming that the 'making of the

arbitration agreement or the failure . . . to perform the same' is not at issue)." *AT&T*

*Mobility LLC*, 563 U.S. at 344, (quoting 9 U.S.C. §§ 2–4).

Under the FAA, arbitration should be compelled if three elements are present: (1)

an enforceable written agreement to arbitrate, (2) a dispute within the scope of the

arbitration agreement, and (3) a refusal to arbitrate. *Scheurer v. Fromm Family Foods LLC*,

863 F.3d 748, 752 (7th Cir. 2017) (citations omitted); 9 U.S.C. § 4. Generally, federal policy

10

favors arbitration, and once an enforceable arbitration contract is shown to exist, questions as to the scope of arbitrable issues should be resolved in favor of arbitration. *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S. Ct. 927, 74 L.Ed.2d 765 (1983).

Here, prongs two and three of the FAA are met. The remaining issue is whether Sedgwick is a third-party beneficiary to the employment contract between LanceSoft and Porter, giving Sedgwick the right to enforce the DRP in the contract.

### A.  Choice of Law

In *Arthur Andersen*, the Supreme Court directly addressed which law governs interpretation of enforcement provisions relating to arbitration agreements. The Supreme Court explained that "traditional principles of state law" govern whether a contract, including an arbitration agreement, is enforceable by or against a non-party. *Arthur Andersen LLP et al., v. Wayne Carlisle, et al.*, 556 U.S. 624, 631 (2009). The Supreme Court stated its holding in terms directly applicable here: "a litigant who was not a party to the relevant arbitration agreement may invoke § 3 if the relevant state contract law allows him to enforce the agreement." *Id*. at 632.

Third-party beneficiary law is thus analyzed under state law and the Court first must determine which state's law applies. Porter worked in Michigan and brought a Michigan state law claim. Sedgwick is an Illinois corporation, with its principal place of business in Illinois. LanceSoft is incorporated in Virginia. Notably, the Employment Agreement also contains a provision that the "validity, construction, interpretation, and

11

enforceability of this Agreement shall be determined and governed by the laws of the Commonwealth of Virginia." (Doc. 14-1, p. 9).

Since the Court exercises diversity jurisdiction over these claims, the Court will apply Illinois choice of law rules to select the applicable state substantive law. *See, e.g., McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014); *Kaufman v. American Exp. Travel Related Servs Co., Inc.*, 2008 WL 687224, at *4 (N.D. Ill. Mar. 7, 2008) ("A district court applies the choice of law rules of the state in which it sits in a diversity case.") (internal citations omitted). When a federal court sits in diversity, courts "look to the choice-of-law rules of the forum state to determine which state's law applies" to the issues before it. *Heiman v. Bimbo Foods Bakeries Distrib. Co.*, 902 F.3d 715, 718 (7th Cir. 2018).

Under Illinois choice-of-law rules, forum law is applied "unless an actual conflict with another state's law is shown, or the parties agree that forum law does not apply." *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 808 (7th Cir. 2020) (citation omitted); *see Bridgeview Health Care Ctr., Ltd. v. State Farm Fire & Cas. Co.*, 381 Ill. Dec. 493, 10 N.E.3d 902, 905 (Ill. 2014) ("A choice-of-law determination is required only when a difference in law will make a difference in the outcome." (quotation omitted)). "Before performing a choice of law analysis, the court must be sure that there is a conflict." *Moje v. Fed. Hockey League, LLC*, 377 F. Supp. 3d 907, 915 (N.D. Ill. 2019). "Under Illinois choice-of-law rules, a conflict of law exists only where the application of one state's law over that of another state will make a difference in the outcome of a case, and where there is no conflict in the relevant state law, a court will apply Illinois law." *Perdue v. Hy-Vee, Inc.*, 455 F. Supp. 3d 749, 758 (C.D. Ill. Apr. 20, 2020) (internal citations omitted) *see also Int'l Adm'rs, Inc. v.*

*Life Ins. Co. of N. Am.*, 753 F.2d 1373, 1376 n.4 (7th Cir. 1985) ("Conflicts [of law] rules are appealed to only when a difference in law will make a difference to the outcome."). "The party seeking the choice-of-law determination bears the burden of demonstrating a conflict." *Bridgeview Health Care Ctr., Ltd.*, 381 Ill. Dec. 493, 10 N.E.3d at 905.

Should the outcome be different under the different state laws, the Court would next need to do a conflict of laws analysis. Illinois uses the "most significant relationship" approach of the Restatement (Second) of Conflicts of Law. *Esser v. McIntyre*, 169 Ill.2d 292, 214 Ill. Dec. 693, 661 N.E.2d 1138, 1141 (Ill. 1996). In applying this test, courts weigh four factors: "(1) where the injury occurred; (2) where the injury-causing conduct occurred; (3) the domicile of the parties; and (4) where the relationship of the parties is centered." *Id*. Generally, the law of the place of injury controls unless some other jurisdiction has a more significant relationship with the occurrence and with the parties. *Id*. However, for the following reasons, the Court does not need to do the "most significant relationship" analysis.

The Parties disagree on which law applies. But both agree it is either Illinois or Virginia law. Thus, the Court will not consider whether Michigan law applies. Porter is adamant that Virginia law applies. (Doc. 16, p. 9–10). Sedgwick argues that Illinois law applies because Illinois is the forum state but contends that "there is no material difference between Virginia and Illinois law on the issues presented." (Doc. 17-1, p. 3). Notwithstanding the disagreement about which law applies, neither party argues that there are outcome determinative differences between Illinois law and Virginia law. Both believe their side prevails, regardless of which law the Court applies.

13

1.  Illinois law

"Illinois courts recognize a 'strong presumption against conferring contractual benefits on noncontracting third parties.'" *Sosa v. Onfido, Inc.*, 8 F.4th 631, 639 (7th Cir. 2021) (citing *Marque Medicos Farnsworth, LLC v. Liberty Mut. Ins. Co.*, 427 Ill. Dec. 218, 117 N.E.3d 1155, 1159 (Ill. App. 1st 2018)). To overcome that presumption, "the implication that the contract applies to third parties must be so strong as to be practically an express declaration." *Id*. (citing *155 Harbor Drive Condo. Ass'n v. Harbor Point Inc.*, 209 Ill. App. 3d 631, 154 Ill. Dec. 365, 568 N.E.2d 365, 375 (Ill. App. Ct. 1991)). It is not enough to show that the "parties know, expect, or even intend that others will benefit from the agreement." *Id*. (citing *Marque*, 427 Ill. Dec. 218, 117 N.E.3d at 1159). Instead, for a nonparty to qualify as a third-party beneficiary, the language of the contract must show that "the contract was made for the direct, not merely incidental, benefit of the third person." *Id*. (citing *Martis v. Grinnell Mut. Reinsurance Co.*, 329 Ill. Dec. 82, 905 N.E.2d 920, 924 (Ill. App. 3d 2009)). This intention "must be shown by an express provision in the contract identifying the third-party beneficiary by name or by description of a class to which the third party belongs." *Id*.

2.  Virginia law

Virginia third-party beneficiary law is based on Virginia Code section 55–22, which provides:

> An immediate estate or interest in or the benefit of a condition respecting any estate may be taken by a person under an instrument, although he be not a party thereto; and if a covenant or promise be made for the benefit, in whole or in part, of a person with whom it is not made, or with whom it

> is made jointly with others, such person, whether named in the instrument or not, may maintain in his own name any action thereon which he might maintain in case it had been made with him only and the consideration had moved from him to the party making such covenant or promise....

It is well-settled that this provision "enables a third party to take an interest under an instrument, although not a party to it, if the promise is made for the third party's benefit and the evidence shows that the contracting parties clearly and definitely intended to confer a benefit upon such third party." *BSI Computer Solutions, Inc. v. City of Richmond, VA*, 122 Fed. App'x. 608, 611 (4th Cir. 2005) (citing *Ashmore v. Herbie Morewitz, Inc.,* 252 Va. 141, 475 S.E.2d 271, 275 (Va. 1996)). But "a person who benefits only incidentally from a contract between others cannot sue thereon." *Id.* (citing *Copenhaver v. Rogers,* 238 Va. 361, 384 S.E.2d 593, 596 (Va. 1989)).

Virginia law provides that "the third party must show that the parties to the contract clearly and definitely intended it to confer a benefit upon him." *Food Lion, Inc. v. S.L. Nusbaum Ins. Agency, Inc.*, 202 F.3d 223, 229 (4th Cir. 2000) (citing *Professional Realty Corp. v. Bender,* 216 Va. 737, 222 S.E.2d 810, 812 (Va. 1976)). In other words, to enforce a contract as third-party beneficiary under Virginia law, Sedgwick must show that LanceSoft and Porter "clearly and definitely intended to confer a benefit" upon Sedgwick.

3. The Outcome is the Same Under Either Illinois Law
   or Virginia Law

Although Illinois law contains the "strong presumption" against third-party beneficiary rights, the outcome is the same under either Illinois or Virginia law. Both Virginia law and Illinois law have the elements "clearly and definitely intended" to

15

confer a benefit upon the third-party; and both exclude parties who only incidentally benefit. *See BSI Computer Solutions Inc.*, 122 Fed. App'x. at 608 (citing *Ashmore*, 475 S.E.2d at 275); *see also Sosa*, 8 F.4th at 639. Illinois law confers third party beneficiary rights to a party when the language of the contract shows that it "was made for the direct, not merely incidental, benefit of the third person" which is "shown by an express provision in the contract identifying the third-party beneficiary by name or by description of a class to which the third party belongs." *see Martis*, 905 N.E.2d at 924; *see also BSI Computer Solutions, Inc.*, 122 Fed. App'x. at 611 (citing *Copenhaver*, 384 S.E.2d at 596).

In other words, the determination of third-party beneficiary rights under either jurisdiction is demonstrated by the same standard and elements. *See Lyon Financial Services, Inc., v. Illinois Paper and Copier Co.*, 732 F.3d 755, 758 (7th Cir. 2013) ("[t]he court acknowledged that the Minnesota choice-of-law clause was likely enforceable but analyzed the claim under Illinois law on the assumption that the two states' laws were materially the same.") *see also Perdue*, 455 F. Supp. 3d at 758 ("Under Illinois choice-of-law rules, a conflict of law exists only where the application of one state's law over that of another state will make a difference in the outcome of a case, and where there is no conflict in the relevant state law, a court will apply Illinois law.") (internal citations omitted). The Court also notes that although Porter argues Virginia law applies, Illinois law, with its "strong presumption" is arguably more favorable to Porter.

### B. Sedgwick Is a Third-Party Beneficiary

The DRP in the Employment Agreement states that "[a]ny dispute or claim between an employee and the Company (including its agents, parents, subsidiaries,

affiliated companies, insurers, customers, clients, or successors), arising out of the employment relationship shall be settled exclusively by binding arbitration." (Doc. 14-1, p. 8). Neither party disputes the existence of the DRP or its general enforceability. *See* (Docs. 14, 16, 17-1, 21, 22). Sedgwick asserts that the "customers" and "clients" category of the DRP in the Employment Agreement covers Sedgwick as the "ultimate business client" where Porter was assigned to work. (Doc. 21, p. 5). Sedgwick further asserts that this this section entitles Sedgwick to enforce legal rights that are available to Magnit under the Supplier Agreement. *Id*.

Conversely, Porter asserts that the language in parentheses is "non-essential" and "simply means that if employee's dispute with Lancesoft 'includes' a Lancesoft client that the dispute between the employee and Lancesoft will still be resolved in arbitration." (Doc. 16, p. 3). In other words, that the DRP did not intend to confer benefits on any party outside of LanceSoft and Porter. The Court is unpersuaded. The plain language reads that if there is a dispute between the employee and LanceSoft's client or customer, then the matter is to be settled by binding arbitration.

The Court distinguishes the present case from *Walker v. Walgreens Specialty Pharmacy, LLC*, 2023 WL 53334609 (N.D. Ill. Aug. 18, 2023). In *Walker*, the court determined that there was insufficient language in the contracts for a third-party to compel arbitration. *Id*. at *14. The contract contained language mandating the parties to arbitrate "[c]overed claims between [plaintiff] and [employer]." *Id*. The court noted there was no ambiguity in the clear language. *Id*. The court therefore declined to insert language into the contract that would cover a third-party beneficiary because the

17

language, as it was written, was "susceptible to one meaning, and only one meaning." *Id*. Importantly, that is not the case here. The plain language of the DRP includes "clients" and "customers" of LanceSoft. The Court will not read that provision out of the agreement merely because it is in parentheses.

Porter argues Sedgwick failed to demonstrate that the LanceSoft employment offer and Employee Agreement clearly and definitely intended to confer a benefit on it. (Doc. 16, p. 10). Porter further argues that Sedgwick is not explicitly identified as a third-party beneficiary nor identified as a client. *Id*. But being labeled as a third-party beneficiary is not the standard—being named or classified as one is. *See Kashkeesh v. Microsoft Corp.*, 679 F. Supp. 3d 731, 735 (N.D. Ill. June 26, 2023) (finding non-signatory was beneficiary where plaintiff agreed to arbitrate any dispute "between themselves and any other entity"); *see also Kelly Health Care, Inc. v. Prudential Ins. Co. of Am.*, 226 Va. 376, 380, 309 S.E.2d 305, 307 (Va. 1983). In the Employment Agreement, "clients" of LanceSoft are expressly included in the DRP. (Doc. 14-1). Additionally, in the employment offer and Employment Agreement, Sedgwick is named as LanceSoft's client. Though that alone may not be enough, the Management Services Agreement and Supplier Agreement nail the point home.

Under the May 2021 Management Services Agreement, Sedgwick engaged Magnit to provide administrative management over Sedgwick's contingent workforce program. (Doc. 21-2, p. 5–6). This included authorization for Magnit to enter into "direct contracts with suppliers." *Id*.

18

In June 2021, Magnit then entered the Supplier Agreement with LanceSoft. (Doc. 21-1, p. 4–11). The first page of the Supplier Agreement expressly states that the Agreement is on Sedgwick's behalf and references the May 2021 Management Services Agreement. *Id.* at 4. Sedgwick is referred to as the "Customer" and LanceSoft is referred to as the "Supplier." *Id.* A relevant portion of the Supplier Agreement is the "Intended Third-Party Beneficiary/Enforcement" subsection that states:

> Supplier understands and agrees that Customers are intended third-party beneficiaries of the Agreement, the Services performed and Work provided pursuant to this agreement *shall have the same rights, titles and interests in and to the Services performed and Work provided as Workforce Logiq, and shall be entitled to enforce such legal rights available to it under this Agreement and all Schedules hereto as it would have were it a party hereto."*

*Id.* at 6 (emphasis added). Put plainly, this provision gives Sedgwick the right to enforce the legal rights available to Magnit under Magnit's Supplier Agreement with LanceSoft. Naturally, Porter disagrees.

Porter asserts that the Management Services Agreement evidences a degree of separation between the parties, stating that Sedgwick pays Magnit for its separate services, and Magnit subsequently pays LanceSoft for its separate services. (Doc. 22, p. 4). Put differently, Porter argues that Sedgwick is "a client or customer of one of LanceSoft's clients or customers." *Id.* at 2, 7. Porter further asserts that Sedgwick is not identified as an intended third-party beneficiary under Porter's DRP with LanceSoft. *Id.* at 2. On its face, this argument is compelling and purports to create a layer between LanceSoft and Sedgwick that would ostensibly preclude Sedgwick from enforcing rights

19

as a third-party beneficiary. But when the Court considers all the agreements and pleadings, a different picture emerges: Porter and LanceSoft did in fact intend to confer a benefit on Sedgwick under the employment offer and Employment Agreement.

Porter's signed employment offer ties it all together. The opening lines of the employment offer expressly refer to Sedgwick as the LanceSoft "client" for whom Porter would be working for. (Doc. 14-1, p. 5). In addition, Porter's employment offer was entirely contingent on "final approval of the client permitting you to commence the project at its site" and that the employment offer "would stand immediately withdrawn in the event of client cancellation of the offer OR LanceSoft Inc not receiving the final approval from the client to start your employment." *Id.* at 6. Porter needed Sedgwick's approval for her employment to commence, thus, Sedgwick was the client LanceSoft referred to. Moreover, Porter was required to submit timesheets for "client approv[al]" each week. *Id.* Indeed, Porter admits to submitting timesheets to Sedgwick. (Doc. 10, ¶¶ 66, 69, 81).

Porter relies on *Kelly Health Care, Inc. v. Prudential Ins. Co. of Am.*, 226 Va. 376, 380, 309 S.E.2d 305, 307 (Va. 1983) and *Isernia v. Danville Regional Medical Center, LLC*, 2024 WL 4697681 (W.D. Va. Nov. 6, 2024). Both are distinguishable from the present case.

In *Kelly Health*, the Virginia Supreme Court, applying Virginia law, makes clear that the third party "must show that the parties to the contract clearly and definitely intended it to confer a benefit" upon the third party. *Kelly Health*, 309 S.E.2d at 307. *Kelly Health* is distinguishable, however, because the purported third-party did not even argue that the parties clearly and definitely intended to confer benefits upon it. *Id.* That is not

20

the case here. Thus, even if this Court were to apply Virginia law, Porter's reliance on *Kelly Health* would not move the needle.

*Isernia* also does not change the outcome. Porter maintains that *Isernia* is "virtually indistinguishable from the present case" (Doc. 16, p. 11), and argues *Isernia* established that "standard clauses that purport to cover general affiliates . . . are too vague to establish" an intended third-party beneficiary. *Isernia*, *2024* WL 4697681 at *7. The court in *Isernia* further stated that the agreement, "[c]onstrued as a whole," between the parties was to "be binding upon the *parties hereto*…." *Id*. at *7. The court reasoned that this language demonstrated that only the two parties in the agreement were contemplated, thus precluding the alleged third party from enforcing. This starkly differs from the present case. Sedgwick is expressly named in the signed employment offer. (Doc. 14-1, p. 5). Sedgwick is referred to as "client" in the signed employment offer and Employment Agreement. *Id*. at 5–10. Sedgwick is also expressly named in the Supplier Agreement between LanceSoft and Magnit. The agreements are interwoven and center around providing Sedgwick with temporary workers, such as Porter. The parties expressly stated as much. Accordingly, LanceSoft and Porter intended to confer a benefit on Sedgwick, thus permitting Sedgwick to enforce the DRP.

### C.  Equitable Estoppel Theory

Sedgwick also brings forth an equitable estoppel theory as to why this Court should compel arbitration. (Doc. 14, p. 10–12). Because the Court is compelling arbitration based on the Employment Agreement, the Court will not address the merits of equitable estoppel.

III.    CONCLUSION

For the foregoing reasons, Sedgwick's Motion to Compel Arbitration (Doc. 13) is GRANTED. This action is STAYED pending arbitration. The parties are ORDERED to submit a joint status report within fourteen (14) days following the completion of the arbitration proceedings.

ENTERED; July 17, 2025.

/s/ Douglas J. Quivey
DOUGLAS J. QUIVEY
UNITED STATES MAGISTRATE JUDGE